# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF MISSOURI
# CENTRAL DIVISION

| | |
|---|---|
| GREATER MIDWEST BUILDERS, LTD., | ) |
| Plaintiff, | ) |
| vs. | ) |
| | ) NO. 2:11-CV-4225-FJG |
| FEDERAL DEPOSIT INSURANCE CORP., ET AL., | ) |
| Defendants. | ) |

## ORDER

Currently pending before the Court is CADC/RADC Venture 2011-1's Motion to Alter or Amend Judgment to Include Damage Amount (Doc. # 106) and CADC/RADC's Motion for Summary Judgment as to Damages (Doc. # 122).

## I. BACKGROUND

In 2005, Plaintiff, Greater Midwest Builders, Ltd. ("GMB") purchased land in Wildwood, Missouri for the purpose of developing, building and selling attached homes. In order to finance this project, GMB entered into various loan transactions with Premier Bank in order to facilitate the development of the Grover Crossing Subdivision in Wildwood, Missouri. On September 7, 2005 plaintiff entered into loan 23498 with Premier Bank, whereby the bank extended a commercial draw account to plaintiff in the amount of $2,677,000. This loan was renewed five times: (September '07, March '08, June '08, June '09 and June '10). During the process of renewal, the total amount available to GMB was changed to $2,252,889.31. As of June 7, 2010, Premier Bank

had loaned GMB the full amount of the commercial draw account under this loan and no further funds were available to plaintiff. Loan 23498 matured on December 7, 2010.

On July 28, 2008, GMB entered into Loan 26544 with Premier Bank whereby Premier extended a commercial draw account to Plaintiff in the amount of $1,126,950. This loan was renewed on two occasions (June '09 and June '10). During the process of renewing, the loan amount was changed to $764,131.84. As of June 7, 2010, Premier Bank had loaned plaintiff the full amount of the commercial draw account and no further funds were available to plaintiff. Loan 26544 also matured on December 7, 2010.

In 2009, Greater Midwest Builders built two display homes in Grover Crossing, but had no financing available to begin building inventory homes for sale. On November 9, 2009, Premier Bank established three irrevocable standby letters of credit in favor of the City of Wildwood and for the account of GMB. In reliance upon Premier Bank's issuance of these Standby Letters of Credit, GMB entered into Letter of Credit Deposit Agreements with the City of Wildwood. The Standby Letters of Credit served as various required deposits.

On October 15, 2010, Premier Bank was placed in receivership and the FDIC-R was appointed receiver. FDIC-R published notice of Premier Bank's receivership as well as notice to creditors on October 21, 2010. In the notice, FDIC-R instructed GMB that all payments under Loan 23498 should be made payable to FDIC-R and advised GMB to immediately seek an alternative funding source. Pursuant to the terms of the renewal note dated June 7, 2010, Loan 23498 matured on December 7, 2010 and all principal and interest became due and owing. GMB failed to make payment in full on

Loan 23498 when it became due and owing on December 7, 2010.

On January 10, 2011 the FDIC-R, sent GMB notice of its repudiation of the three letters of credit. It also notified GMB that its failure to pay Loan 23498 in full on its maturity date constituted a default under Loan 23498. On January 26, 2011, the FDIC-R sent a demand letter to GMB requesting immediate payment of Loan 23498 in full. On February 17, 2011, the FDIC-R notified GMB that it was exercising its right of repudiation of Loan 23498. On May 16, 2011, in accordance with 12 U.S.C. § 1821, plaintiff filed a Proof of Claim with the FDIC alleging actual damages and setoff. On June 27, 2011, the FDIC mailed it Notice of Disallowance to Plaintiff. On August 24, 2011, the FDIC sold and/or assigned its interest in the loans and/or security instruments to CADC/RADC Venture 2011-1, L.L.C.

Plaintiff asserted three causes of action: Count I - Actual Damages Resulting from Repudiation Under 12 U.S.C. § 1821(e)(3) against the FDIC; Count II - Setoff against all defendants and Count III - Declaratory Judgment against all defendants. The FDIC-R sought summary judgment on all of GMB's claims. CADC also sought summary judgment on GMB's claims against it as well as summary judgment on its counterclaim against GMB and its third-party complaint against the guarantors, Greater Midwest Builders, Inc, Paul Campbell and Sarajane Campbell. On December 11, 2012, this Court granted the FDIC's motion for summary judgment on all three counts of the Complaint and also granted CADC's motion for summary judgment on Counts II and III. The Order also granted CADC's motion for summary judgment on its Counterclaim, finding that plaintiff's refusal to pay the outstanding amounts due under the loans was a default under the terms of the loan. The Court did not make a monetary award of

damages, because CADC did not request in the Motion for Summary Judgment, that an award of damages be entered.  CADC filed a Motion seeking to Alter the Judgment to include a dollar judgment against the counterclaim defendants.  Plaintiff/Counterclaim defendants and Third-Party defendants[1] argued that there were issues of fact surrounding the issue of damages.  Therefore, the Court on May 13, 2013, directed the parties to brief the issue.

## II. STANDARD

A moving party is entitled to summary judgment on a claim only if there is a showing that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed.R.Civ.P. 56(c).  "[T]he substantive law will identify which facts are material.  Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).  If the moving party meets this requirement, the burden shifts to the non-moving party to "set forth specific facts showing that there is a genuine issue for trial."  Anderson, 477 U.S. 242, 248 (1986).  In Matsushita Electric Industrial Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), the Court emphasized that the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts" in order to establish a genuine issue of fact sufficient to warrant trial.  In reviewing a motion for summary judgment, the court must view the evidence in the light most favorable to the

---

[1] The Court will use the term "counterclaim defendants" to refer collectively to Greater Midwest Builders, Ltd. and Paul and Sarajane Campbell.

non-moving party, giving that party the benefit of all inferences that may be reasonably drawn from the evidence. Matsushia, 475 U.S. 574, 588; Tyler v. Harper, 744 F.2d 653, 655 (8th Cir. 1984), cert. denied, 470 U.S. 1057 (1985).

### III. DISCUSSION

A. **Loans 23498 & 26544**

In support of its Motion for Summary Judgment, CADC attached the four guaranties which were executed by Paul and SaraJane Campbell individually on each of the two loans. Additionally, CADC in support of its Motion for Summary Judgment attached the affidavit of Mante Dzkuma, who is an Asset Manager for Sabal Financial, LP. Sabal Financial is the servicer and attorney in fact for CADC/RADC Venture 2011-1, LLC ("CADC"). In his affidavit, Mr. Dzkuma states that he is aware of how CADC keeps information about the loans it has purchased, including the amounts due and owing under the loans. Mr. Dzkuma states that the records are made during or shortly after an event has occurred and the records are kept as a matter of custom in its everyday business. Mr. Dzkuma states that as to the loans purchased, it receives the original loan instruments and maintains these instruments as part of its records. Mr. Dzkuma states that the records reflect that in December 7, 2010, when Loan 23498 matured, $2,252,889.31 in outstanding principal, plus outstanding interest, was due and owing by the Counterclaim defendants. Until the maturity date, the only payments made by the borrower were interest payments. The Counterclaim defendants did not make any payments on the loan when it matured on December 7, 2010. Interest on this loan was charged at 6% until default, at which time the rate increased to the current

5

variable rate, plus 10%. On April 2, 2012, CADC made a demand that the Counterclaim defendants pay the full amount of the principal, interest and costs which were due and owing under the Loan.

On December 7, 2010, when Loan 26544 matured, $764,131.84 in outstanding principal, plus outstanding interest was due and owing by the Counterclaim defendants. Counterclaim defendants did not make any payments on Loan 26544 when it matured on December 7, 2010. Under the terms of the loan, 6% interest was charged until default, at which time it was escalated to the then variable rate plus 10%. On April 2, 2012, CADC made a demand on the Counterclaim defendants for all principal, interest and costs due and owing under the loan.

On May 14, 2012, CADC purchased the subject property at a foreclosure for a credit bid of $1,200,000. On the date of the foreclosure sale, $3,409,664.29 in outstanding principal, interest and fees was due to CADC, with $2,536,209.49 (74.38%) being attributable to Loan 23498 and $873,454.80 (25.62%) being attributable to Loan 26544. The Credit Bid was allocated between the two loans in accordance with the percentages above and this resulted in a credit of $1,643,613.88 for Loan 23498 and a credit of $566.050.41 on Loan 26544.

Counterclaim defendants raise three arguments in opposition to the Motion for Summary Judgment. They argue that CADC has failed to offer any evidence in support of its damages calculations and that the affidavit offered is defective. Secondly, they argue that CADC has failed to refute their affirmative defense that the sale of the property was not conducted in a commercially reasonable manner. Finally, counterclaim defendants argue that the damages are inaccurate and the damages sought do not

6

account for the limit set forth in the guaranties. The Court will examine each of these arguments in turn.

### B. Evidence Relating to Damages/Calculation of Damages

Counterclaim defendants argue that CADC has failed to offer any evidence in support of its damages. They argue that Mr. Dzkuma's affidavit is ineffective because it states only that he reviewed business records, but does not state which records he reviewed and does not explain how the damage calculations were arrived at. Counterclaim defendants argue that the 16% default interest rate is improper under the terms of the loans.

With regard to the Affidavit of Mr. Dzkuma, CADC argues that this affidavit is proper and complies with the requirements of Fed.R.Civ.P. 56. Fed.R.Civ.P. 56(c)(4) states:

> An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

CADC argues that Mr. Dzkuma's affidavit states that he has personal knowledge of the information in the affidavit, describes his job duties and CADC's method of record keeping. He also states that CADC maintains the original loan instruments and these were the records which he reviewed in calculating the damage amounts due under both loans. The Court agrees and finds nothing improper in Mr. Dzkuma's affidavit.

Counterclaim defendants also argue that the 16% interest rate used by Mr. Dzkuma is "clearly improper under the terms of Loan 23498 and Loan 26544." Counterclaim defendants argue that the Promissory Notes state "In such event (default),

7

interest will accrue on the outstanding Principal balance at the variable Interest Rate in effect from time to time, plus an additional 10.000 percent, until paid in full." Counterclaim defendants cite to Exhibit C as support for this statement. (Doc. # 126-1, p. 13). Counterclaim defendants state that Section 4.E defines the variable interest rate as the Wall Street Prime rate, which was at 3.25% on December 16, 2008. Counterclaim defendants argue that the per diem interest rate on the loans appears to be calculated at 16% which simply adds 10% to the initial 6% interest rate and ignores the terms of the Promissory Note which ties the default interest rate to the variable interest rate. However, as CADC points out, the Note which counterclaim defendants were quoting from was an unexecuted note dated June 7, 2008. The Note on which CADC sued the counterclaim defendants is dated June 7, 2010 (Doc. # 59-1, p. 18). Note 23498 states that the interest rate applicable would be the Wall Street U.S. Prime Rate, plus two percent. However, CADC notes that plaintiffs/third-party defendants neglected to mention ¶ 5(E)(4)(a) of the Promissory Note. This section states:

(4) Limitations. The Interest Rate changes are subject to the following limitations:

   (a) Lifetime. The Interest Rate will never be less than 6.000 percent.

     Thus, CADC argues that the interest rate in effect when the Borrower defaulted was six percent and upon default, the interest rate was increased by 10 percent, for a total interest rate of 16%. Loan 26544 contains identical language regarding the interest rate. (Doc. # 59-6, pp. 9-10). Thus, the Court concludes that the interest rate was properly calculated in Mr. Dzkuma's affidavit.

8

### C. Counterclaim Defendants' Affirmative Defense - <u>Improper Foreclosure Sale</u>

Secondly, counterclaim defendants argue that CADC's damage calculation is based in part on a foreclosure sale of Grover Crossing conducted on May 14, 2012. In response to CADC's counterclaims, plaintiff asserted as an affirmative defense that the foreclosure sale was not conducted in a commercially reasonable manner. Counterclaim defendants base this argument on deposition testimony of Plaintiff's president, Daniel Barnard, who testified at his deposition that he had received information that CADC entered into a contract with McBride Homes soon after it purchased the property, to sell the Grover Crossing property for $1,800,000.00. Counterclaim defendants state that this statement was made to Mr. Barnard by Matthew Bukhshtaber, who is a vice-president of CBRE and who was acting as CADC's agent and broker at the time the statement was made. Thus, counterclaim defendants argue that it is an admissible non-hearsay statement made by an opposing party. Counterclaim defendants argue that this sale raises serious questions about whether the sale was conducted so as to obtain the best possible price, whether CADC chilled bidding in order to quickly turn around and sell the property to another buyer at its actual market value, thus generating a $600,000 profit.

CADC notes that "[t]he rule is well established that mere inadequacy of consideration is insufficient to invalidate a sale." <u>Missouri Foreclosure Manual</u>, § 4:15 (2012-2013). CADC notes that there is an exception if the sale price is so "gross as to shock the conscience." <u>Id</u>. But CADC notes that a forced sale which was two-thirds of the alleged price at a subsequent sale, does not meet this criteria. Similarly, in <u>Meng v.

9

Case 2:11-cv-04225-FJG   Document 137   Filed 09/27/13   Page 9 of 14

CitiMortgage, Inc., No. 4:12-CV-514-CAS, 2013 WL 1319008 (E.D.Mo. Mar. 29,2013), the Court stated, "[i]t is a well-established rule in Missouri that mere inadequacy of consideration, without more, will not justify setting aside a foreclosure sale. . . .If a sale is fairly and lawfully conducted, without fraud and partiality and with full opportunity for competitive bidding, an inadequate sale price alone will not justify setting aside a foreclosure sale." Id. at *5 (internal citations and quotations omitted). Counterclaim defendants state that the allegedly inadequate sale price followed shortly by a sale to another party at a slightly higher price "raises serious questions of fact as to whether the foreclosure sale was conducted so as to garner the best possible price (thereby appropriately reducing the deficiency), whether CADC chilled bidding at the sale in order to turn around and complete a prearranged deal to sell the real property to McBride at its actual market value for profit and without crediting that amount to the claimed deficiency (thereby enjoying a $600,000 windfall), and ultimately, whether the claimed damages are accurate." (Counterclaim Defendant's Suggestions in Opposition, p. 10). However, other than their argument that the price was inadequate, counterclaim defendants offer nothing else in support of this argument. They do not claim that the sale was inadequately advertised, that it was conducted unfairly or that potential buyers were prevented from bidding on the property. Therefore, the Court rejects the counterclaim defendants' affirmative defense that the sale was somehow tainted and finds that this does not reduce the damages which CADC is entitled to.

### D. Guaranty Limitations

The counterclaim defendants argue that the damage calculation fails to account for the $2,000,000 liability limit set forth in the Campbell guaranties. Counterclaim

defendants argue that the Campbell guaranties are limited to a total of $2,000,000.00 of unpaid principal, accrued interest, attorneys' fees and collection costs. Counterclaim defendants state that CADC has failed to present any evidence which accounts for the limitations in the guaranties, and thus there is nothing in the record for the Court to consider in support of the motion. CADC argues that the Court has already found that the borrower's liability has been determined and therefore argues that there are no genuine issues of fact as to the Guarantors' liability pursuant to their Guaranties. Paul and Sarajane Campbell each individually executed a Guaranty for both Loan 23498 and Loan 26544. Counterclaim defendants attached to their Suggestions in Opposition, the four guaranties issued by Paul and SaraJane Campbell (Exhs. A & B), for both of the loans. Each of the Guaranties contains the following language: "I am unconditionally liable under the Guaranty, regardless of whether or not you pursue any of your remedies against the Borrower, against any other maker, surety, guarantor or endorser of the Debt or against the Property. You may sue me alone, or anyone else who is obligated on this Guaranty, or any number of us together, to collect the Debt." CADC argues that because the guarantors signed separate Guaranties for each of the loans, and because each Guaranty limited the "Debt" to the specific note securing the loan, a plain reading of the Guaranty means that Paul Campbell guaranties up to $2,000,000 of the principal amount of Borrower's indebtedness as to Loan 23498 and $2,000,000 of the principal amount of Borrower's indebtedness as to Loan 26544. The same would be true for Sarajane Campbell. CADC states that the outstanding principal balance of each loan is less than the $2,000,000 maximum guaranteed by the Campbells. Thus, CADC argues the Campbells are jointly and severally liable for the full amount of the

11

Borrower's indebtedness, all principal, interest, fees and costs. The Court agrees and finds that because neither remaining loan balance exceeds $2,000,000.00, the Campbells are each jointly and severally liable for the full amount of the indebtedness, plus all interest, fees and costs.

**E. Accuracy of Damage Calculation**

The Counterclaim defendants also argue that the damages requested are inaccurate and are disputed. Specifically, they argue that the damage calculation includes interest and late fees without providing any evidence, other than an affidavit to establish that interest and late fees are allowed, properly calculated or calculated with the proper rates. The Court has already discussed Mr. Dzkuma's affidavit and finds it to be sufficient. However, the Court finds that the calculation of the amounts needs further clarification.

When Loan 23498 matured on December 7, 2010, $2,252,889.31 in outstanding principal, plus outstanding interest was due. (Dzkuma Aff. ¶ 5). When Loan 26544 matured on December 7, 2010, the amount of $764,131.84, plus outstanding interest was due. (Dzkuma Aff. ¶ 7). Interest was charged at 6% until default, at which time the interest rate escalated to 16%. CADC is also entitled to its fees and costs in seeking to enforce its rights under the Notes. On May 14, 2012, CADC sold the subject property for $1,200,000.00. (Dzkuma Aff.¶ 10). On that date, the outstanding balance for Loan 23498 was $2,536,209.49 and for Loan 26544 it was $873,454.80. (Dzkuma Aff. ¶ 11). The proceeds from the sale of the property were allocated between the two loans which resulted in a balance of $1,643,613.88 due on Loan 23498 and $566,050.41 due on Loan 26544. The per diem charges for interest were $720.49 for Loan 23498 and

12

$248.13 for Loan 26544. Thus, as of the date the Court granted CADC's motion for summary judgment, December 11, 2012, CADC states that the counterclaim defendants owed a total of $1,817,972.46 on Loan 23498, comprised of principal of $1,643,613.88 and unpaid interest of $174,358.58. CADC states that the counterclaim defendants owed a total of $626,097.87 on Loan 26544, comprised of principal of $566,050.41 and unpaid interest of $60,047.46.

However, in determining the number of days between May 14, 2012 (Date of Foreclosure Sale) and December 11, 2012 (Date of Order granting summary judgment), the Court calculates a total of 211 days. Multiplying 211 by the per diem rate of interest for Loan 23498 ($720.49), yields unpaid interest of $152,023.39. In analyzing this issue, the Court believes that CADC calculated interest for 242 days ($174,358.58 (amount of unpaid interest) ÷ $720.49 (per diem rate) = 242). This amounts to an extra 31 days of interest. The Court is unsure why CADC would calculate interest for 242 days or if this is simply a mathematical error. The same error appears in relation to Loan 26544's calculations. Because the difference in one month's interest for both loans is a sizeable amount, the Court will not enter judgment in a specific amount of damages at this time. However, as discussed above, because the Court has determined that CADC is entitled to a damage award on its claims, the Court will **GRANT** CADC's Motion to Alter or Amend Judgment (Doc. # 106) and **GRANT** CADC's Motion for Summary Judgment (Doc. # 122). The specific amount of the damages award will be determined after the Court reviews CADC's supplemental briefing regarding the interest calculation.

## IV. CONCLUSION

Accordingly, for the reasons stated above, the Court hereby **GRANTS** CADC's Motion to Alter the Judgement (Doc. # 106) and **GRANTS** CADC's Motion for Summary Judgment. The Court hereby **ORDERS** CADC to file a supplemental brief explaining the interest calculation for the loans on or before **October 7, 2013**.


Date: <u>September 27, 2013</u>                   **S/ FERNANDO J. GAITAN, JR.**
Kansas City, Missouri                         Fernando J. Gaitan, Jr.
                                                          Chief United States District Judge